357 So.2d 749 (1978)
CITY OF HOMESTEAD, Appellant,
v.
RANEY CONSTRUCTION, INC., Appellee.
No. 77-1624.
District Court of Appeal of Florida, Third District.
April 11, 1978.
Sams, Anderson & Ward and R. Thomas Farrar, Miami, for appellant.
Ruden, Barnett, McClosky, Schuster & Schmerer and William H. Lefkowitz, Fort Lauderdale, for appellee.
Before PEARSON, HUBBART and KEHOE, JJ.
PEARSON, Judge.
Defendant, City of Homestead, appeals a partial summary judgment finding the City liable for damages on an alleged contract between the City and a general contractor for the construction of a swimming pool. The City does not urge that the partial summary judgment is barred by a genuine issue of material fact, but rather that the *750 facts presented to the trial judge show, as a matter of law, that the City Council was without authority to enter into the contract alleged, and that the claimed contract was, in fact, unlawful.
Discussions by the City Council about letting bids for construction of a municipal swimming pool began as early as July, 1975. On August 18, 1975, the City Council decided to hire an engineering firm to design a proposed olympic-sized pool. In November, 1975, the City Council unanimously voted to let bids in order to find out how much the pool would cost and invitations to bid on the construction of the pool were published.
On November 28, 1975, the bids were opened at a City Council meeting and referred to the City Manager, purchasing agent and engineers for analysis and recommendations. At an adjourned meeting of the City Council on December 3, 1975, the City Manager reported that the low bid was from Raney Construction, Inc., the appellee herein.
After discussion and the failure of a motion to postpone action, Councilman Glenn, seconded by Councilman Rutzke, made the following oral motion:
"I move that we accept the recommendation of the City Manager and his committee to build the swimming pool award it to Raney Construction Co. that construction will start after Feb. 12 or the bicentennial exercises being held at Harris Field and that the Rodeo grounds be restructured and moved at the expense of the City. And that the money be derived from the Federal Revenue Sharing that will be coming into the General Fund of Jan. 1 of approximately 106,000.00 and the bond issue of 130,000.00 and that we take the next six months revenue sharing at the end of January first or July 1 or January 30, 1976 and that the remainder of the money would come from the surplus fund of the City."[1]
Dr. House (a councilman) objected on the ground that the swimming pool contract should not be awarded by an oral motion. He made a final appeal to the Council to reconsider. The motion carried by a vote of four to three.
On December 5, 1975, the engineers advised Raney by letter that the City Council had authorized acceptance of Raney's bid. The authorization was expressly conditioned upon notice to proceed not being issued prior to February 12, 1976. On December 8, 1975, Raney and the then Mayor of the City, Fred Rhodes, signed the contract which is the subject of this action. The City Clerk attested the signature and the City Attorney approved the contract as to form.
In connection with the signing, the City Manager personally spoke with Mr. Stanley Raney of Raney Construction, Inc., and advised him that there had been considerable controversy at the City Council meeting of December 3, 1975, at which the City Council by a one vote margin voted to authorize acceptance of the Raney bid. Mr. Raney was specifically advised that the procedure by which the authorization was made had been questioned by certain members of the City Council. The City Manager also advised Mr. Raney not to proceed without further authorization from the City Manager's office.
Notwithstanding these instructions by the City Manager, on December 10, 1975, Mr. Stanley Raney went to the Miami offices of Fidelity and Deposit Company of Maryland where he arranged for the performance bond called for by the construction agreement. No payments were made *751 by Raney with respect to the bond, however, and no other costs and expenses were incurred by Raney.
On December 9, 1975, elections were held in the City of Homestead. As a result, two Council members were not re-elected and Dr. House replaced Fred Rhodes as Mayor.
On December 10, 1975, the City Manager again advised Mr. Stanley Raney by telephone that in view of the general attitude of the City Council concerning the swimming pool question, and to avoid further complications, there was a possibility the contract might be re-examined. Mr. Raney was to advise the City Manager of the position of Raney Construction regarding re-examination or termination of the contract. On December 12, 1975, the City Manager wrote Raney to the same effect.
At the City Council meeting of December 15, 1975, the swimming pool matter was again discussed. The City Manager advised the Council that the $572,000 bid had been awarded and the contract signed, although no order to proceed had been given. Councilwoman Campbell pointed out that the motion by which construction was approved failed to provide for all the funds necessary to build the project, and that funding of the pool was expected to come up $250,000 short of the quoted bid. Mayor House said that at the time the bid was awarded, he made objection and said he thought the proceedings were improper.
On January 5, 1976, the City Council again met and considered the swimming pool question. The City Attorney prepared, and the City Council passed, a resolution which rescinded the swimming pool contract due to improprieties in the manner under which it was awarded, including, but not limited to, the fact that the bid was awarded by motion rather than resolution, and that the monies were not appropriated by resolution.
By letter of January 13, 1976, Raney was advised that the City had determined the contract to have been improperly awarded, and that notice to proceed with the construction agreement would not be forthcoming.
On these facts, the trial judge determined that a contract came into existence and that the plaintiff, Raney Construction, was entitled to damages as a matter of law.
The City's appeal offers two reasons for its position that no contract came into existence. First, it is urged that it was unlawful for the mayor to execute the contract because the action required authorization by letter, an ordinance or a written resolution. The City cites the following provision of its City Code:
"Whenever it shall be necessary for the city, under the authority of its city council, its Charter and the general law of the state, to execute contracts, deeds, leases, promissory notes or other instruments in writing on behalf of the city, such contract, deed, lease, promissory note or other instrument in writing shall be executed by the mayor on behalf of the city and attested by the city clerk, who shall place thereon the seal of the city. In case any instrument so executed shall be required to be acknowledged, it shall be the duty of the mayor of the city to make proper acknowledgment of such instrument before an officer authorized to take acknowledgments. It shall not, however, be lawful for the mayor of the city to execute or for the clerk thereof to attach the corporate seal of the city to any contract, deed, lease, promissory note or other instrument in writing without authority so to do granted by ordinance or resolution of the city council, properly entered in the minutes of the council, authorizing the execution and attestation of such instrument. Nothing in this section shall, however, be construed to require the execution of the bonds of the city in any other manner than that provided for by law and the Charter of the city. (Code 1958, § 2-4.)" [Emphasis supplied by appellant]
The question then is whether this provision of the Code has the force of law so that an action of the City taken on motion is void. The general rule with respect to the mode by which a municipal *752 contract must be authorized is stated in McQuillin, The Law of Municipal Corporations (3d ed. 1966).
* * * * * *
"And where the applicable laws have authorized a municipality to make a contract but do not require it to be done by ordinance, the legislative body of the municipality may contract by vote upon a motion, or by passage of a resolution." (Revised Vol. 10, § 29.19)
* * *
This general law has been recognized in Haskins v. City of De Soto, 35 S.W.2d 964 (Mo. App. 1931). We know of no holding to the contrary in this state. It is apparent that the City Code of the City of Homestead does not have the status of "applicable law."
In Dedmond v. Escambia County, 244 So.2d 758 (Fla. 1st DCA 1971), the court was faced with a fact pattern somewhat similar to the present one in that the board of commissioners had advertised a proposed lease and accepted plaintiff's bid, then sought to rescind its motion. It was held that a binding contract existed. The court, in so holding, quoted from State ex rel. Wadkins v. Owens, 62 So.2d 403 (Fla. 1953), where the Supreme Court said:
* * * * * *
"Fair dealing is required by all parties and public officials should set the example. There is no question raised in this proceeding of any concealment, fraud, collusion or any other misconduct on the part of the appellant and the appellees should have been required to comply with the plain and unmistakable provisions of the law."
In Berry v. Okaloosa County, 334 So.2d 349 (Fla. 1st DCA 1976), the court held a county board could rescind its action in awarding a contract at the same meeting where it was awarded. But the clear import of the decision was that a binding contract did come into being with the acceptance of a bid unless the action was rescinded at the same continuous meeting.
We hold that the City Code requiring a resolution of the City Council did not invalidate the contract which was completed and the plaintiff notified of its acceptance. The City, because of a change in the personnel of the Council, ought not be allowed to use the technicality of the direction provisions of its code to defeat the contract that came into being with the acceptance of plaintiff's bid.
The second aspect of the City's position is that because a fair reading of the City Code called for all actions of the City Council which required the expenditure of public money to be by resolution, a person dealing with the City must, at his peril, inquire into the power of the municipality and its officers to make the contract contemplated. See Ramsey v. City of Kissimmee, 139 Fla. 107, 190 So. 474 (1939). The cited case holds that where the City Council did not take any vote on adoption of the contract submitted to the contractor, a purported contract signed by the mayor-commissioner would not be enforced. It is certainly true that the completion of the contract in the instant case would have required the appropriation of money. Does it follow then that the contract itself must be approved with the formality required for the appropriation of money? We think not. Appropriations of money are separate from the entering of contracts by the City. An appropriation is not considered a condition precedent to the validity of a contract by a city. See the principle of law in Simpson v. City of Highwood, 372 Ill. 212, 23 N.E.2d 62 (1939); Izzo v. City of Loves Park, 20 Ill. App.2d 117, 155 N.E.2d 312 (1959); and De Leuw, Cather & Co. v. City of Joliet, 327 Ill. App. 453, 64 N.E.2d 779 (1946). It would doubtless be wise for a city council to make sure that the money is available before contracting for expenditures, but such wisdom is not always evident in public or private contracts. If the sins of the fathers are visited upon the sons, then it is not unnatural that the mistakes of elected officials are visited on the electors.
Affirmed.
NOTES
[1] This motion was Councilman Glenn's best recollection of the same motion he made earlier in the meeting to the effect that:

"I'd like to move to approve the construction of the swimming pool and award the bid to Raney Construction for $572,930.00. Construction not to commence until after Feb. 12, this would be the completion of the bicentennial, and that the location of the pool would be at the Harris Field complex in the vicinity of the rodeo grounds and that the rodeo grounds be restructured and replaced at the cost of the city adjacent to the swimming pool complex, and that the money be taken from the bond issue of $130,000.00 and from the $106,000.00 revenue sharing is to come in January first to be placed in the surplus ..."