JORGENSON, Judge,
dissenting.
After the final gun had sounded, though the score was not tied, the City of Miami sought to send the game into overtime. Today’s majority opinion not only sanctions an improper extra period of play, it allows the game’s rules to be changed well after the game has ended. I therefore respectfully dissent.
Unlike Gaines v. Nortrust Realty Management, Inc., 422 So.2d 1037 (Fla. 3d DCA 1982), where all settlement discussions were held off the record, the parties to the instant settlement agreement ratified it during a public meeting of the City of Miami Commission and, in addition, exchanged letters of acceptance. The complete terms of the settlement were embodied in a resolution adopted by the city commission, signed by the mayor, attested to by the city clerk, prepared and approved by an assistant city attorney, and approved as to form and correctness by the city attorney.
The instant case, therefore, more closely resembles Sheffield Poly-Glaz Inc. v. Humboldt Glass Co., 356 N.E.2d 837, 42 Ill.App. 865, 1 Ill.Dec. 555 (1976), distinguished by the court in Gaines. In Sheffield the parties, through their counsel, reached a meeting of the minds. After settlement was reached, a party, claiming he had misunderstood its terms, sought to repudiate it. The trial court held that there was a binding, enforceable agreement and that “[e]ven if ... [the party] had misunderstood the terms of the compromise ... the mistake was a unilateral one due to [the party’s] own failure to understand a fact which was at the center of the parties’ dispute. We think [the party] is bound to the agreement knowingly made.” 356 N.E.2d at 841, 1 Ill.Dec. at 559. The reasoning of the Illinois court and the result it *609 reached apply to the instant case and should be followed by this 'court today.
The essential terms of the City’s settlement with the Dolphins were that (1) the Dolphins agreed to play a tenth game in the Orange Bowl in 1985 and 1986 (the original contract called for nine games) or pay $30,000 if the tenth games were not played for any reason; (2) the public liability insurance policy limits paid for by the Dolphins were to be raised from $250,-000/$l,000,000 to $500,000/$2,000,000; (3) the Dolphins agreed to be liable “for any structural deficiencies, negligent maintenance, or negligent actions of the City of Miami employees” (for which the Dolphins were not responsible under the existing 1977 agreement with the City); and (4) the city manager was to enter into a supplemental agreement on behalf of the city agreeing to the aforementioned terms.
The city commission meeting adopting the resolution took place on July 18, 1983.[1] On July 19 a letter was sent to the Dolphins’ legal counsel from the city attorney’s office confirming “that the City Commission accepted your settlement proposal,” cancelling a deposition scheduled in anticipation of trial, and informing the Dolphin’s legal counsel that the proposed stipulation and order of dismissal would be sent by the end of the week.
On August 3, 1983, the legal counsel for the City delivered to the legal counsel for the Dolphins a stipulation and order of settlement and general release, both drafted by the City’s legal counsel.[2] The Dolphins and their legal counsel fully executed the documents which provided that (1) the Dolphins would enter into a supplemental agreement to the 1977 agreement amending paragraphs 20 and 21 of the 1977 agreement, increasing insurance coverage; (2) the Dolphins would play a tenth game in 1985 and 1986 “or, in the alternative, if the said tenth home game is not played for any reason, [would] pay to the City of Miami Thirty Thousand ($30,000) Dollars for each tenth game not played ... ”; and (3) “the parties hereby released admit no liability of any sort by reason of past conduct.”
Then, on August 4,1983, the City sent its “Supplemental Agreement to the June 8, 1977 agreement” to the Dolphins’ legal counsel. It contained all the terms agreed to at the city commission meeting and contained in the stipulation and order of settlement and general release plus an additional term that was never discussed or negotiated, much less agreed to by the parties.
The 1977 agreement contained two force majeure clauses, paragraphs 28 and 29. They provided:
28. No liability of any kind shall be incurred by either of the parties hereto *610 should the ORANGE BOWL Stadium during the term of this Agreement become unfit for events to be played or staged therein because of any Act of God or public enemy....
29. If ORANGE BOWL Stadium is condemned or is so damaged due to fire, windstorm, or other catastrophe, and CITY decides not to repair or rebuild, either party may cancel, terminate, and declare this agreement terminated.
The supplemental agreement sent by the City on August 4, 1983, provided:
Further, paragraph No. 28 of the June 8, 1977 agreement is amended as follows: No liability of any kind shall be incurred by either of the parties hereto should the ORANGE BOWL Stadium, during the term of- this Agreement become unfit for events to be pla4ed [sic] or stated therein because of any Act of God or Public Enemy except that this provision will in no fashion or way relieve the PARTNERSHIP of its obligation to pay Thirty Thousand Dollars ($30,000.00) per each guaranteed tenth home game in the 1985 and 1986 seasons not played as set forth in paragraph No. 2 of this SUPPLEMENTAL AGREEMENT as such obligation is assumed in partial compensation for the PARTNERSHIP’S failure of performance under the June 8, 1977 AGREEMENT prior to July 18, 1983....
The supplemental agreement sent by the City, with its “compensation for ... failure of performance” language, contradicted the “no liability” provision of the release and added the additional term of modification of paragraph 28, the force majeure clause.
The Dolphins filed a motion to enforce the settlement provided the changes proposed to paragraph 28 were stricken. They attached as exhibits the transcript of the July 18, 1983, city commission meeting, the stipulation of settlement and order of dismissal (drafted by the City) and the release of all claims (also drafted by the City). The trial court entered an order and final judgment enforcing the settlement and dismissing the action and struck the proposed changes to paragraph 28 but enforced the remainder of the settlement.[3]
*611 Interpretation of settlement agreements is guided by certain well settled principles of law. “Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits.” Pearson v. Ecological Science Corp., 522 F.2d 171, 186 (5th Cir.1975), cert. denied mem., 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976) (quoting D.H. Overmyer Co. v. Loflin, 440 F.2d 1213, 1215 (5th Cir.1971)); see Dorson v. Dorson, 393 So.2d 632 (Fla. 4th DCA 1981). Settlement agreements are to be interpreted by the same principles governing the interpretation of contracts. See Florida Education Association, Inc. v. Atkinson, 481 F.2d 662 (5th Cir.1973); Gaines; Dorson.
“A municipal corporation is bound to recognize its contracts, the same as an individual.” City of Miami v. Bus Benches Co., 174 So.2d 49, 52 (Fla. 3d DCA 1965); accord Williams v. City of Jacksonville, 118 Fla. 671, 160 So. 15 (1935). “[W]here the applicable laws have authorized a municipality to make a contract but do not require it to be done by ordinance the legislative body of the municipality may contract ... by passage of a resolution.” City of Homestead v. Raney Construction, Inc., 357 So.2d 749, 752 (Fla. 3d DCA 1978) (quoting 10 E. McQuillin, The Law of Municipal Corporations § 29.19 (3d Ed.1966)). As in the instant case the contract in Ra-ney was signed by the mayor, the city clerk attested the signature and the city attorney approved the contract as to form. The court in Raney held that once a contract was accepted by a motion of the Homestead City Council and notification of the acceptance was sent to the other party to the contract, a binding contract came into being which the city council could not subsequently unilaterally rescind. We did not allow the Homestead City Council to take such a reprehensible action then and should not allow the City of Miami to do so now.
The court in Raney, quoting the Florida Supreme Court, State ex rel. Wadkins v. Owens, 62 So.2d 403, 404 (Fla.1953), said,
Fair dealing is required by all parties and public officials should set the example. There is no question raised in this proceeding of any concealment, fraud, collusion or any other misconduct on the part of the [citizen] and the [government] should have been required to comply with the plain and unmistakable provisions of the law.
Raney at 754. The City of Miami should be held to this same standard.
The settlement agreement in question is a modification of an existing contract between the parties and must be viewed as a component of the whole 1977 agreement. The intention of the parties to a contract must be determined from a consideration of the whole agreement. Florida Power Corp. v. City of Tallahassee, 154 Fla. 638, 18 So.2d 671 (1944); Torcise v. Perez, 319 So.2d 41 (Fla. 3d DCA 1975); Transport Rental Systems v. Hertz Corp., 129 So.2d 454 (Fla. 3d DCA 1961).
Considering the settlement reached by the Dolphins and the City (as reflected in the transcript of the city commission meeting and the original settlement documents) not in a vacuum, but as a part of the whole 1977 agreement between the parties, the inescapable conclusion is that the parties did reach an agreement “sufficiently specific as to be capable of implementation,” Gaines at 1039, following which the' city attempted to unilaterally alter certain terms. If ambiguity does in fact exist in a contract, “the court should arrive at an interpretation ‘consistent with reason, probability and the practical aspect of the transaction between the parties.’ ” Biltmore Systems v. Mai Kai, Inc., 413 So.2d 458, 459 (Fla. 4th DCA 1982) (quoting Blackshear Manufacturing Co. v. Fralick, 88 Fla. 589, 593, 102 So. 753, 954 (1925)).
The City argues and the majority agrees that (1) the agreement reached between the parties requires the Dolphins to pay $30,-000 if the tenth game is not played in 1985 or 1986 for any reason including act of God or public enemy or (2) the parties did not have a meeting of the minds as to this “essential” element of the settlement *612 agreement. The logic of this argument fails when considered in light of the provision of the 1977 contract it was intended to replace.
The 1977 contract provides that the “[partnership agrees to pay the tax for 9 games in each regular football season whether or not 9 games are actually played in the ORANGE BOWL” (emphasis added). Any meaningful difference between the phrases “for any reason” and “whether or not” when used in the context of the agreement at issue is beyond comprehension.
The intention of the parties as determined “from the language used, objects to be accomplished, other provisions in the agreement which might shed light upon the question, and circumstances under which it was entered into,” Bal Harbour Shops, Inc. v. Greenleaf & Crosby Co., 274 So.2d 13, 15 (Fla. 3d DCA 1973), was that the. Dolphins would pay $30,000 to the City if the tenth game were not played. See J & S Coin Operated Machines, Inc. v. Gottlieb, 362 So.2d 38 (Fla. 3d DCA 1978). The payment of the $30,000, as well as any other terms of the settlement, must be viewed as a modification and in light of the provisions of the whole 1977 agreement between the parties.
In Florida Power Corp. the court was faced with a contract containing two conflicting provisions; one, a liquidated damage clause to be paid to its customer, the City of Tallahassee, if power were interrupted for certain periods of time, and, two, a provision excusing the company for interruptions caused by an act of God. After a hurricane interrupted power for several hours the city sought to collect under the liquidated damage provision. In holding that the act of God clause prevailed, Justice Chapman, speaking for the court, said that
conditions and circumstances surrounding [sic] the parties and the object or objects to be obtained when executing the contract should be considered.... courts should place themselves, as near as possible, in the exact situation of the parties to the instrument, when executed, so as to determine the intention of the parties, objects to be accomplished, obligations created, time of performance, duration, consideration, mutuality, and other essential features.
Id. 18 So.2d at 674.
Considering these principles of contract construction I conclude that the parties did reach and agree to a judicially enforceable settlement agreement. Should the “highly improbable” events occur and render the Orange Bowl unfit to play a tenth game in 1985 or 1986 the parties should then be free to litigate any differences concerning interpretation of the whole 1977 agreement, including the modification agreed to in the settlement. That issue is not now before this court. The sole issue is whether an enforceable settlement was reached. For the foregoing reasons I believe that one was and would affirm the final judgment of the trial court.

. At the commission meeting, Mayor Maurice Ferre commented,
My problem is that I am willing that [sic] to settle this thing because I think that is a fair settlement. There is only one thing you have forgotten. I want to make sure that when we settle this we have settled everything. I don’t want any personal law suits. I don’t want law suits on suiting [sic] Howard Gary for what he said or Ferre for what he said, or anybody in the City for what they said, or any other pending law suits. In other words, the same thing that we did, I want the same clause as the last time we had a fight with Mr. Robbie, we said we would go back to ground zero. No more law suits. In other words, if we settle this, we settle them all.
Commissioner Joe Carrollo's description of the proposed settlement was:
I think that number one, the Dolphins have increased the insurance benefits, that is a plus that we have received, and a compromise on their part. Number two, the proposal that they have made for the extra game in ’85 and ’86 is going to represent to this City [a] more substantial amount than even if we were to take it to court and win the most we possibly could. I think that Mr. Shevin and the Mayor have presented this quite well. So, I think that what we have now is a situation where both parties are willing to compromise. I think that while it is a fair compromise for the Dolphins, it is an excellent compromise for the City of Miami.

. A careful reading of the record below reveals that the City drafted all versions of all settlement documents, both those that reflect and those that contradict the settlement agreed to by the parties. Contrary to the majority’s assertion, there is no Dolphins’ version. The only versions are the agreed-upon settlement and the City’s unilaterally altered version of the settlement.

. The findings of the court were in part:
3. The terms of the_ settlement are consistently encompassed by the transcript of the proceedings before the Miami City Commission on July 18, 1983, at which time the settlement was reached, and Resolution Number 83-625 passed by the Miami City Commission (Defendants’ Exhibit D, as supplemented), which properly authorized the settlement of this action.
4. The documents prepared and forwarded to Defendants’ counsel by Plaintiff's counsel for purposes of consummation of the settlement, i.e., the Stipulation of Settlement (with proposed Order of Dismissal with respect to same), the Release of Claims to be executed on behalf of the Defendants, the Supplemental Agreement to the June 8, 1977 Agreement and the Release of Claims to be executed on behalf of the City of Miami (Defendants’ Exhibits E, F, G and H, respectively, and collectively referred to herein as the "Settlement Documents”), were and are in full conformity with the expressed intent of the parties to the settlement, save and except for the single change proposed by the City of Miami for inclusion in the Supplemental Agreement (Defendants' Exhibit G, middle of Page Number 3) to Paragraph 28 of the original June 8, 1977 Agreement, the so-called "Act of God/Public Enemy” clause.

6. There is no material variation in the proposed Settlement Documents which were forwarded to the Defendants by the City of Miami that was not contained in the Resolution and not covered in the meeting of the City Commission on July 18th, except, as noted, the proposed change to the Act of God/Public Enemy clause of the June 8, 1977 Agreement.
7. The Court is not determining, in the event that an act of God or an act of public enemy occurs, how that problem would be decided. If such an event occurs, then that will be adjudicated under the original Agreement of June 8, 1977, which covers it very succinctly in Paragraph 28, as supplemented by the Settlement Documents, exclusive of the proposed change to Paragraph 28. The terms of that original contract in regards to Paragraph 28 were plainly not discussed, and in the event that any other of the terms of the main contract were to be changed beyond those discussed as part of the settlement, the City of Miami should have brought them up and discussed them at the time of the settlement, which it did not do. Otherwise, the Defendants are entitled to rely upon the original contract of June 8, 1977 being enforced, subject only to the modifications thereof by the terms of the settlement where were expressly agreed upon.